[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10864

_____

D. C. Docket No. 06-00845-CV-KD-B

MARIETTA PIELAGE,

Plaintiff-Appellant,

versus

JAMES VINCENT MCCONNELL, III.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(February 15, 2008)**

Before EDMONDSON, Chief Judge, CARNES and FAY, Circuit Judges.

CARNES, Circuit Judge:

While child custody battles are all too common, it is not often that one of

them finds its way into the federal courts. Those that do usually come by way of

an action brought under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11 (ICARA), which implements the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.  This is one of those cases.

Plaintiff Mariette Pielage, a native of the Netherlands, is involved in a child custody battle with James Vincent McConnell, III, a native of this country.  That battle is being fought in the Circuit Court of Baldwin County, Alabama, and in the course of it the state court issued a <u>ne exeat</u> order, which forbids Pielage from removing the child from its jurisdiction pending its decision.  Pielage filed a complaint in federal district court claiming that the state court's order constitutes a "wrongful retention" under the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by ICARA.  The district court dismissed her complaint and this is Pielage's appeal.

**I.**

Because this case comes to us after the grant of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, we take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  <u>See</u> <u>Glover v. Liggett Group, Inc.</u>, 459 F.3d 1304, 1308 (11th Cir. 2006).  In that light, the facts are as follows.

In March 2003 Mariette Pielage traveled with her boyfriend from the Netherlands to Fairhope, Alabama to explore a job opportunity there. When their relationship ended in May 2003, Pielage returned to her home in the Netherlands with the couple's child (who is not involved in the present dispute). Pielage came back to Fairhope in February 2004 so that she and her child could visit the boy's father, who had remained there.

During that visit, Pielage met James Vincent McConnell, III, and after a brief courtship, in April 2004 the two became engaged to be married. In December 2004, Pielage became pregnant with McConnell's child. She was living in Fairhope during this time, but she traveled back to the Netherlands every ninety days to renew the visitor's visa that permitted her to be in this country.

In May 2005 Pielage went to the Netherlands, expecting to return to Fairhope in early June. While in the Netherlands, she learned that McConnell had begun dating another woman in Fairhope. The bloom left the rose in a hurry. By mid-June 2005, McConnell had called off his engagement with Pielage, told her to stay in the Netherlands, and cancelled the ticket for her return flight to the United States. Around the same time, McConnell became engaged to his new girlfriend, whom he has since married.

Pielage did not heed McConnell's advice to remain in the Netherlands, but instead returned to the United States on June 29, 2005, reentering this country on a visa waiver. She decided for medical reasons to give birth to her and McConnell's baby in the United States, and the child, Josha Pielage, was born on September 17, 2005. Since his birth, two passports have been issued for Josha: one by the Dutch government on November 15, 2005, and one by the United States government on March 28, 2006.

On September 27, 2005, Pielage applied for a visa extension for medical reasons, and her application was granted. Her attorney then wrote McConnell a letter requesting child support, and McConnell responded by questioning the child's paternity and insisting that a DNA test be performed. The DNA test was scheduled for October 24, 2005, but it was postponed because Pielage had a medical problem.

On December 12, 2005, Pielage returned to the Netherlands with Josha in order to register him as a resident in the Dutch Registry, which she did. While in the Netherlands, Pielage began negotiating the purchase of a new home to replace the apartment she had been renting there for the previous four years. On December 29, 2005, while she was still in the Netherlands, Pielage learned that McConnell had filed an action in the Circuit Court of Baldwin County, Alabama (which

4

includes Fairhope), asking that court to order a DNA test to determine whether he was the father of Josha Pielage and, if he was, to "thereafter conduct a hearing and reach an adjudication as to paternity of the minor child; custody; child support, and visitation." The court issued an order on January 5, 2006 requiring the DNA test and also setting a final hearing in the case for April 13, 2006. The next day, Pielage returned to the United States to comply with that order.

The DNA test was completed on January 30, 2005, and it established that McConnell is Josha's father.[1] The state court scheduled a custody hearing, but that hearing has been continually postponed and still has not been held.[2]

Pielage returned to the Netherlands on March 19, 2006, to close on the house that she had purchased there, and to set up with her father a company to import and sell American gift cards in the Netherlands. She then returned to the United States on April 9, 2006, under a B-2 visitor visa with a limited duration of 180 days. On May 15, 2006, Pielage applied for an H1B visitor visa, which would allow her to

---

[1] The complaint does not specify the results of the DNA test, but elsewhere it alleges that Pielage was "pregnant with Mr. McConnell's child." In addition, McConnell filed an amended petition in state court alleging that he is the father. So, both parties agree that McConnell is the father.

[2] At oral argument, the parties informed us that a final custody hearing had been scheduled for September 20, 2007, but it was continued to December 3, 2007. They have since informed us that the hearing had been continued yet again. It is not clear whether the pendency of this federal court proceeding has contributed to the delay in resolving the state court litigation, but we hope that the state court will not interpret anything that the district court has said or that we are saying as a reason not to decide that case as soon as it otherwise would.

work in the United States and to freely enter and exit the country during the custody proceedings. Her application was approved and that visa went into effect in October 2006.

In her complaint, Pielage alleges that all of her time in the United States was just visits, and that the Netherlands is both her and Josha's "habitual residence." Any thoughts she had about returning to the Netherlands while the custody battle was ongoing were interrupted on September 6, 2006, when the Baldwin County Circuit Court granted McConnell's ex parte motion for what is known by its Latin name as a ne exeat order. That order prohibited Pielage from removing Josha from the state court's jurisdiction until the custody dispute was resolved. The purpose of the order apparently was to ensure that the court retained jurisdiction to decide the case and that any decision it reached could be enforced. See Thompson v. Evans, 54 So. 2d 775, 776 (Ala. 1951) ("The purpose of the writ [of ne exeat] is to insure compliance with orders and decrees of courts of equity and to restrain the respondent, in certain cases, from leaving the jurisdiction.").[3] The state court order did not specify the geographical limits of its jurisdiction—whether it meant for

_____

[3]Pielage did not suggest to the state court that it lacked jurisdiction to decide the paternity, child custody, child support, or any other issues until she filed on November 21, 2007 a motion to dismiss the case on the ground that under Alabama's version of the Uniform Child Custody and Jurisdiction and Enforcement Act, his home state was the Netherlands. That motion apparently remains pending.

Pielage to keep the child within the geographical confines of Baldwin County or within the State of Alabama as a whole. It does not matter for our purposes.

On December 12, 2006, thirteen weeks after the ne exeat order was issued, Pielage filed a complaint in the United States District Court for the Southern District of Alabama, claiming that the order constituted an "unlawful retention" that deprived her of her custody rights, in violation of the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11. (The use of the adjective "unlawful" to describe the alleged retention is hers; the Act itself addresses "wrongful" retention or removal.) Pielage requested multiple forms of relief, including an order from the district court: (1) directing that Josha be returned to his "habitual residence of the Netherlands;" and (2) immediately "staying all State Court custody proceedings" while her Hague Convention petition was pending. McConnell, who is the only defendant named in the complaint, responded with a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, arguing that the state court's ne exeat order did not constitute an "unlawful retention" within the meaning of ICARA.

In ruling on the motion, the district court assumed that the Netherlands was Josha's habitual residence. Even with that assumption, the district court agreed

with McConnell that the state court <u>ne exeat</u> order did not constitute a wrongful removal or retention under ICARA, because it was undisputed that Josha had been in Pielage's physical custody since his birth, and she still had physical custody of him after the order was entered. Based on that reasoning, the district court dismissed Pielage's complaint for failure to state a claim.

## II.

In <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1250–51 (11th Cir. 2004), we explained that Congress enacted ICARA to implement the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Hague Convention). The Hague Convention, we stated, "was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State' and to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" <u>Id.</u> (quoting Hague Convention art. 1, T.I.A.S. No. 11,670, at 4, 1343 U.N.T.S. 89, at 98). We have also recognized that "[t]he Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" <u>Lops v. Lops</u>, 140 F.3d 927, 936 (11th Cir. 1998) (citation omitted). Both the United States and the Netherlands are Contracting States.

Under ICARA, a person may file a petition for return of a child in "any court which has jurisdiction of such action . . . in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b). Our inquiry in an action for the return of a child "is limited to the merits of the abduction claim and not the merits of the underlying custody battle." Ruiz, 392 F.3d at 1250. In order to prevail, the party seeking relief under § 11603(b) must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Hague Convention. 42 U.S.C. § 11603(e)(1).

The operative provision in the Hague Convention with respect to the term "wrongful removal or retention" is Article 3, Ruiz, 392 F.3d at 1251, which defines a removal or retention of a child as "wrongful" when:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

9

Hague Convention art. 3, T.I.A.S. No. 11,670, at 4–5, 1343 U.N.T.S. 89, at 98–99.

In order to mold the facts of this case into a viable claim for relief under the Hague Convention and ICARA, Pielage must establish that the state court <u>ne exeat</u> order constitutes a wrongful removal or retention of Josha within the meaning of Article 3 of the Convention. <u>See</u> 42 U.S.C. § 11603(e)(1)(A). She does not contend that it is a wrongful removal, but instead argues that it is a wrongful retention.

**III.**

Pielage contends that the Alabama state court's <u>ne exeat</u> order constitutes a wrongful retention of Josha under the Hague Convention, as implemented by ICARA, because it amounts to an interference with her custodial right to return the child to his habitual residence in the Netherlands. The district court assumed that the Netherlands was the child's habitual residence, and although McConnell disputes that, we will make the same assumption.

This is an unusual Hague Convention and ICARA case. Most of them involve the non-custodial parent removing the child from the custodial parent or retaining the child after a permitted visitation period has ended. <u>See, e.g.</u>, <u>Ruiz</u>, 392 F.3d at 1250 (alleging that a mother wrongfully removed children from Mexico to Florida without the father's permission); <u>Toren v. Toren</u>, 191 F.3d 23, 26 (1st Cir. 1999) (alleging that a mother wrongfully retained children in

10

Massachusetts when they should have been returned to their father in Israel).  Here we have the unique claim that the order of a state court prohibiting one parent from removing the child from its jurisdiction pending a custody determination is a wrongful retention under the Hague Convention.

The obvious initial issue is whether there has been a "retention" at all under the Hague Convention.  See Toren, 191 F.3d at 27 n.3 ("The structure of [Article 3 of the Hague Convention] clearly establishes the proper order of inquiry:  first, the court should inquire into whether there has been any removal or retention at all; and second, the court should inquire into whether such removal or retention has been wrongful.").  "When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used. . . .  Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."  Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699–700, 108 S. Ct. 2104, 2108 (1988) (internal quotation marks and citations omitted).

Neither the Hague Convention nor ICARA actually defines the term "retention."  Pielage, however, points us to Article V of the Hague Convention, which defines a parent's "rights of custody" over a child as including "the right to

11

determine the child's place of residence."  Hague Convention art. 5, T.I.A.S. No. 11,670, at 5, 1343 U.N.T.S. 89, at 99.  Using that definition, Pielage contends that the state court ne exeat order is interfering with one of her rights of custody by preventing her from removing Josha from the state court's jurisdiction to take him to her desired place of residence—the Netherlands.  According to her, that is all she needs to show to state a valid claim under the Hague Convention.

We are not persuaded to define "retention" to include every breach of a parent's rights of custody.  Doing that would render the treaty's definition of "wrongful" superfluous.  After all, the treaty provides that a retention is wrongful only where "it is in breach of rights of custody attributed to a person, an institution or any other body."  Hague Convention art. 3, T.I.A.S. No. 11,670, at 4, 1343 U.N.T.S. 89, at 98.  That necessarily means that there are some retentions that are not wrongful.  Under Pielage's construction, however, none would be.  Any breach of the rights of custody would be a retention and it would be wrongful.  There would be no retention unless there were a wrongful one.

We have said, however, that "[t]reaties, like statutes, should be construed so that no words are treated as being meaningless, redundant, or mere surplusage." Yapp v. Reno, 26 F.3d 1562, 1569 (11th Cir. 1994).  If every breach of a right of custody is a retention, as Pielage insists, then the key term "wrongful retention" is

12

redundant. The proper interpretation of the Convention's phrase "wrongful retention" must give "retention" meaning apart from "wrongful."

According to one dictionary, the primary definition of the term "retain" is "to keep possession of." Random House Unabridged Dictionary 1643 (2d ed. 1993). This meaning of the term "retention" is supported by the Pérez-Vera Report,[4] which states that the Hague Convention was meant to remedy situations where a "child is taken out of the family and social environment in which [he] has developed." Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, in 3 Acts and Documents of the Fourteenth Session, Child Abduction ¶ 12 (1982). This indicates that the term "retention" is meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment. See also id. ¶ 110 ("In fact, we must not forget that it is the right of children not to be removed from a particular environment which sometimes is a basically family one, which the fight against international child abductions seeks to protect.").

At the time the ne exeat order was issued Josha was just under a year old. His mother had carried him back and forth between the Netherlands and this

---

[4] As we noted in Ruiz, "Elisa Perez-Vera was the official Hague Conference reporter whose report is 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'" Ruiz, 392 F.3d at 1251 n.2 (citation omitted).

country. In order to avoid deciding where Josha habitually resided, we have assumed that his habitual residence was in the Netherlands, as Pielage contends. But we cannot assume away the statements in Pielage's own complaint. Taking what she has alleged as true, as we must, Josha spent ten of his first twelve months on this earth in Baldwin County, Alabama, and only two months in the Netherlands.[5] His social environment, to the extent he had one apart from his mother, was in this country. His family environment was with his mother. The state ne exeat order changed none of that. Under that order Josha remained with his mother in the same family and social environment where he had been for ten of the twelve months (and all of the last five months) of his life. Because the order did not disrupt or otherwise alter the "family and social environment in which [he] has developed," it is not the type of "retention" that the Hague Convention was intended to remedy. See id. ¶ 12.

Pielage argues in her brief that "[i]f the Hague Convention means anything, it means that a child may not be retained away from the place where (s)he

_____

[5] According to the allegations in the complaint, Josha was born in Fairhope, Alabama on September 17, 2005. He then spent the first three months of his life in Alabama. On December 12, 2005, Pielage traveled to the Netherlands with Josha, and they returned to Alabama on January 6, 2006. At that point, Josha spent another two months in Alabama. On March 19, 2006, Pielage returned with Josha to the Netherlands, and they came back to Alabama on April 9, 2006. Josha then spent the next five months in Alabama, at which time the state court entered the ne exeat order. Therefore, from the time he was born until the ne exeat order was entered, which was approximately one year, Josha spent a total of ten months in Alabama and only two months in the Netherlands.

14

habitually resides, against the wishes and needs of his or her custodian." This is not entirely accurate. According to the Pérez-Vera Report, the treaty's "reference to children 'wrongfully retained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom [he] was staying." Id. ¶ 57 (emphasis added). In other words, the Hague Convention was meant to cover the situation where a child has been kept by another person away from the petitioner claiming rights under the Convention, not where the petitioner still retains the child but is prevented from removing him from the jurisdiction.

Although the preamble to the Hague Convention does state that one of its purposes is the return of the child to its state of habitual residence, see Hague Convention preamble, T.I.A.S. No. 11,670, at 4, 1343 U.N.T.S. 89, at 98, the substantive provisions of the treaty are silent on where the child is to be returned. This silence, according to the Pérez-Vera Report, was intentional and must be "understood as allowing the authorities of the State of refuge to return the child directly to the applicant, regardless of the latter's present place of residence." Pérez-Vera, supra, ¶ 110. In cases such as this one, where the child remains in the physical care of the petitioner, it is impossible "to return the child directly to the

15

applicant." Id. That is so because there has been no "retention" within the

meaning of the Convention. There having been no retention, there can have been

no "wrongful retention."

## V.

Because the state court's <u>ne exeat</u> order does not constitute a "retention"

within the meaning of the Hague Convention, we conclude that the district court

did not err in granting McConnell's motion to dismiss.

**AFFIRMED.**

EDMONDSON, Chief Judge, CONCURS in the result.