[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 03, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16847

_____

D. C. Docket No. 06-00334-CV-4-RH-WCS

WATERS EDGE LIVING LLC, a Florida Limited
Liability Company,
WATERS EDGE JW LLC, a Florida Limited Liability
Company,

Plaintiffs-Counter-Defendants-
Interpleaders-Claimants-Appellants,

TRUSTMARK NATIONAL BANK,
HANCOCK BANK OF FLORIDA,

Plaintiffs-Claimants,

versus

RSUI INDEMINITY COMPANY, a New Hampshire
Corporation,

Defendant-Intervenor-Defendant-
Interpleader-Appellee,

PRIME INCOME ASSET MANAGEMENT, INC.,
a Nevada Corporation,

Defendant-Counter-Claimant,

THE BALDWIN COMPANY, INC.,

Claimant,

CONTINENTAL BARONNE, INC.,

Intervenor.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(December 3, 2009)

Before CARNES, FAY and ALARCÓN,[*] Circuit Judges.

PER CURIAM:

Plaintiffs Waters Edge Living, LLC and Waters Edge JW, LLC (collectively "Waters Edge") appeal the district court's dismissal with prejudice of their Amended Post-Interpleader Complaint for failure to state a claim on which relief could be granted. This lawsuit arises out of a dispute between competing claimants to a single insurance policy. The Amended Post-Interpleader Complaint, which is the operative one that we will refer to as "the complaint," contains Waters Edge's claims against RSUI Indemnity Company based on RSUI's mishandling of an

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

alleged agreement with Waters Edge for the payment of Waters Edge's losses after Hurricane Katrina.

I.

When a case comes to us after the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted, "we take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Pielage v. McConnell, 516 F.3d 1282, 1284 (2008). Viewed through that lens, the facts for present purposes are as follows.

In July 2005 Waters Edge purchased the Waters Edge apartment complex in Gulfport, Mississippi, from a real estate trust controlled by Prime Income Asset Management, Inc. Prime retained no interest in the complex. As part of the deal, Prime agreed for the property to remain covered for Waters Edge's benefit under Prime's master property insurance policy for nine months following the closing. The master policy also covered properties owned by Prime in Texas and Louisiana.

The master policy covered rent loss and estimated replacement cost in the event a covered property suffered damage. It also covered the cost of rebuilding to upgraded code specifications once rebuilding actually occurred. The master policy limit was $100,000,000 consisting of a primary policy with a $10,000,000 limit and two layers of excess coverage: (1) a first layer of excess coverage with a

3

$10,000,000 limit and (2) a second layer of excess coverage with an $80,000,000 limit provided by RSUI. This appeal concerns only the RSUI policy.

Because the total value of the properties covered by the master policy exceeded $100,000,000, the possibility existed that there would not be enough coverage if multiple covered properties were damaged in a single event. Hurricane Katrina was that event. It destroyed the Waters Edge apartments and also damaged Prime's covered properties in Louisiana.

The primary insurer paid the limit of its policy to Prime. Prime paid Waters Edge approximately $1.8 million out of this payment. Prime based the amount of that payment on the estimated value of Waters Edge's anticipated lost rents.

Waters Edge then tried to recover the rest of its losses from RSUI. It did so by working with RSUI's insurance adjuster. After a back and forth exchange spanning two months, Waters Edge and RSUI determined that Waters Edge's property loss was $30,929,371, not including the cost of code upgrades that might be incurred once rebuilding actually occurred. RSUI's adjuster sent Waters Edge a memorandum on January 23, 2006, stating:

> Let's wrap up for R/C [replacement cost] figure of $30,929,371 and move on. Your client is doubling their money so this represents a heck of a deal. The $30 M is subject to policy provisions as interpreted by RSUI.

On February 1, 2006 Waters Edge asked RSUI's adjuster to confirm that

4

agreement in writing. On February 2, the adjuster responded with a memorandum confirming that "the building loss at Waters Edge is $30.9 million subject to policy provisions." That same day, the adjuster also wrote an email explaining that "subject to policy provisions is necessary until RC issue [is] resolved." According to Waters Edge, this reservation meant that if the policy required it, RSUI might hold back 20% of the agreed loss as depreciation until rebuilding occurred. That reservation disappeared when RSUI provided "official word" that it would not withhold depreciation.

According to the complaint, all of this means that RSUI and Waters Edge reached an agreement that RSUI would pay Waters Edge's replacement costs, which according to the parties' agreement totaled $30,929,371. After a $1,000,000 policy deductible was factored in, $29,929,371 remained to be paid.

Because the damage to covered properties exceeded the policy limit, Prime feared that it would not be able to recover its own losses. Prime insisted that only it could receive payment under the terms of the RSUI policy and that it would therefore have to sign off as the policyholder on any payments made to Waters Edge. When Waters Edge learned through one of its mortgagees that RSUI was delaying payment while it waited on Prime, as policyholder, to make a claim, Waters Edge hired counsel and demanded payment from RSUI.

5

While these events unfolded, the first layer excess insurer paid its full $10,000,000 policy limit to Prime. When Waters Edge learned of this, it filed suit against RSUI. In the face of conflicting demands from Waters Edge and Prime, RSUI delivered two checks to Waters Edge. One check was in the amount of $29,929,371, the amount that Waters Edge and RSUI had agreed on as the estimated replacement cost. The other check was for $2,039,652 to cover Waters Edge's lost rents. RSUI included Prime as a co-payee on the checks. Because Prime would not sign off on the payments, Waters Edge could not receive any of the proceeds.

Now that the trench lines had been dug, the parties agreed to place the funds, totaling $31,969,023, into a custodial account until the stalemate could be broken. Meanwhile, RSUI continued to pay Prime for its losses. Those payments eventually totaled $30,448,038. This left only $17,582,939 of the policy proceeds remaining. Fearing that the remaining policy funds might not be enough to pay all of the remaining claims, RSUI deposited the full $17,582,939 in the custodial account along with the original $31,969,023, which was the total of the two checks on which it had listed Prime and Waters Edge as co-payees.

In an attempt to avoid being caught in no man's land between two belligerents, RSUI filed counterclaims interpleading the funds in the custodial

6

account so that Prime and Waters Edge would be forced to battle each other for the funds. Waters Edge and Prime each claimed the right to receive the remaining policy proceeds while challenging the losses claimed by the other. RSUI remained as neutral as Switzerland and sought only to limit its total liability to the $80,000,000 policy limit.

Just before trial, Waters Edge and Prime agreed to a settlement. Under the terms of their agreement, Waters Edge received $24,000,000 and Prime received the rest of the funds in the escrow account. At that point, RSUI had paid out the full $80,000,000 policy limit, but Waters Edge had received approximately $6,000,000 less than the amount stated in its agreement with RSUI.

RSUI probably hoped that the interpleader action would be the litigation-to-end-all-litigation regarding this policy, but that was not to be. While the settlement of the interpleader action extinguished Waters Edge's claims against the escrow account, Waters Edge had reserved its separate claims against RSUI. The complaint asserts those separate claims, which include: (1) breach of a settlement agreement; (2) failure to timely pay a settled loss in violation of the Texas Insurance Code; (3) breach of the duty of good faith; and (4) misrepresentation. The district court dismissed the complaint with prejudice on RSUI's Rule 12(b)(6) motion. Waters Edge then brought this appeal.

## II.

We review <u>de novo</u> a district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). <u>Chepstow Ltd. v. Hunt</u>, 381 F.3d 1077, 1080 (11th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); <u>Sinatrainal v. Coca-Cola Co.</u>, 578 F.3d 1252, 1268 (11th Cir. 2009). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, __ U.S. __, 129 S. Ct. at 1949. A complaint does not state a facially plausible claim for relief if it shows only "a sheer possibility that the defendant acted unlawfully." <u>Id.</u> While a complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (quotation marks and citations omitted).

## III.

### A.

Count I alleges that RSUI breached a settlement agreement with Waters

8

Edge. The complaint asserts that the exchange between RSUI's adjuster and Waters Edge in early January and February of 2006 culminated in a binding settlement agreement requiring RSUI to pay Waters Edge $29,929,371, a figure representing the value of the agreed estimated property loss less the $1,000,000 policy deductible.

The alleged settlement agreement, as embodied in the confirmation memorandum sent by RSUI, stated that Waters Edge's entitlement to payment was subject to the provisions of the policy as interpreted by RSUI. The complaint also states that a subsequent email from the adjuster, sent the same day as the confirmation memorandum, explained that the "subject to policy provisions" term in the settlement agreement applied only to the issue of whether RSUI would withhold 20% of the agreed replacement cost as depreciation until rebuilding actually occurred. The complaint further states that this qualification vanished when RSUI provided "official word" that it would not withhold 20% of the negotiated replacement cost until rebuilding occurred.

According to the complaint, these alleged facts demonstrate that "[t]he settlement accord created an independent obligation apart from the policy for [RSUI] to pay [Waters Edge's] loss as compromised" and that "[g]eneral policy terms were not part of the settlement agreement." Waters Edge claims that RSUI

9

breached this settlement agreement when it included Prime as a co-payee on the checks tendered to Waters Edge, effectively stopping Waters Edge from receiving the settlement proceeds.

The district court erred when it dismissed Count I of the complaint because Count I states a claim to relief that is plausible on its face. See Iqbal, __ U.S. __, 129 S. Ct. at 1949. The factual content of the complaint, particularly the alleged exchange between Waters Edge and RSUI's adjuster, allows a reasonable inference that the parties reached a settlement agreement creating a contractual obligation independent of the policy. See id. It does not compel that inference, but it does allow a reasonable factfinder to draw the inference. If the factfinder does draw the inference, RSUI breached the independent agreement when it included Prime as a co-payee on the checks tendered to Waters Edge. Because Count I states a facially plausible claim for relief, the district court erred when it dismissed Count I for failure to state a claim on which relief can be granted.

B.

Count II of the complaint claims that RSUI "violated Chapter[s] 541 and 542 of the Texas Insurance Code by not making timely payment of a settled loss."[1]

---

[1] The district court did not determine which state's law would govern Waters Edge's various claims, finding that it was unnecessary to address that issue in order to rule on the 12(b)(6) motion before it. Waters Edge argues that Texas law governs its claims. RSUI does not directly dispute that argument but states that it does not matter which state's law applies. We take that as

The district court dismissed that claim based on its conclusion that Waters Edge had failed to plead factual allegations plausibly supporting the existence of a binding settlement agreement between RSUI and Waters Edge. We disagree with that conclusion. As discussed above, Waters Edge's factual allegations allow the reasonable inference that Waters Edge entered into a binding settlement with RSUI. According to the complaint, RSUI did not fulfill its obligations under that agreement. Because Waters Edge alleged that it entered a binding settlement agreement with RSUI and that RSUI did not make payment as required by that agreement, Waters Edge pleaded facts sufficient to state a claim for relief that is plausible on its face based on RSUI's failure to make timely payment of a settled loss. See Iqbal, __ U.S. __, 129 S. Ct. at 1949.

C.

Count III alleges that RSUI breached its duty of good faith by improperly including Prime as a co-payee on the checks tendered to Waters Edge and by "skipping over [Waters Edge's] settled loss to pay Prime's unsettled losses, including amounts that were not and could never be due." Even viewed in the light most favorable to Waters Edge, the factual allegations in the complaint do not state a facially plausible claim of breach of the duty of good faith. The allegations that

a waiver by RSUI of any argument that Texas law does not apply.

11

RSUI gave in to Prime's demand that it withhold payment to Waters Edge "in deference to its business relation with Prime" and that "RSUI treated [Waters Edge] unfairly, unreasonably preferring Prime among its coinsureds" are nothing more than conclusory statements. Under Iqbal, "naked assertions devoid of further factual enhancement" are not enough to overcome a Rule 12(b)(6) motion to dismiss. Iqbal, __ U.S. __, 129 S. Ct. at 1949 (quotation marks and citation omitted).

If you take out the labels, conclusions, and formulaic recitations, id., the factual allegations contained in the complaint actually indicate that RSUI acted in good faith. As the district court explained, RSUI promptly settled with Waters Edge. When faced with the thorny legal issue of what effect the agreement with Waters Edge had on Prime's rights under the policy, RSUI tried to balance the interests of Waters Edge and Prime by listing them as co-payees on the checks. Finally, when the stalemate between Waters Edge and Prime proved intractable, RSUI admitted liability for the entire policy limit and interpleaded the funds. While Waters Edge has stated a claim that RSUI breached the alleged independent settlement agreement, it has not pleaded factual allegations sufficient to allow us to draw a reasonable inference that RSUI did so in bad faith. Id. at __, 129 S. Ct. at 1949. The district court properly dismissed Count III.

D.

Count IV alleges misrepresentation. Waters Edge claims that RSUI's insurance adjuster misrepresented to Waters Edge that Prime, as policyholder, would have to agree to any payment made to Waters Edge and that this misrepresentation caused Waters Edge to delay its demand for payment of the amount due under the settlement, "prevent[ing] them from timely realizing the full benefit of their reasonable settlement." According to Waters Edge, the allegations contained in the complaint adequately state claims under the theories of statutory misrepresentation under the Texas Insurance Code and common law misrepresentation.[2] We disagree.

Waters Edge contends that Count IV alleges that RSUI's statement that Prime would have to consent to payment to Waters Edge constituted a misrepresentation in violation of the Texas Insurance Code. In its initial brief, Waters Edge cites Tex. Ins. Code §§ 541.060(a)(1) and 541.061(1), (3), and (4) as the statutory provisions violated by RSUI. But these statutory subsections appear

---

[2] Waters Edge also devotes one sentence in its brief to arguing that the district court erred in holding that it failed to allege fraud with sufficient particularity to meet the pleading standards of Fed. R. Civ. P. 9(b). Waters Edge argues that Rule 9(b) does not apply to its misrepresentation claim and that "Waters Edge met [the Fed. R. Civ. P. 9(b)] standard in any event." Because Waters Edge briefed in such a cursory fashion the issue of whether its allegations meet the particularity requirement of Rule 9(b), we could deem that argument waived. See In re Globe Mfg. Corp., 567 F.3d 1291, 1297 n.3 (11th Cir. 2009). It does not matter, though, because even if that requirement does not apply to Count IV, it still fails to state a claim.

13

nowhere in Count IV.

Waters Edge relies on the fact that Count IV realleges paragraph 71 of the complaint. Paragraph 71 says that "RSUI violated Chapter[s] 541 and 542 of the Texas Insurance Code by not making timely payment of a settled loss." Despite the general leniency of the pleading requirements under the Federal Rules of Civil Procedure, "it is axiomatic that defendants remain entitled to know exactly what claims are being brought against them." Omar ex rel. Cannon v. Lindsey, 334 F.3d 1246, 1250 (11th Cir. 2003) (citing Fed. R. Civ. P. 8 & 10). A sentence in the complaint alleging that RSUI violated two unnamed chapters of the Texas Insurance Code by failing to timely pay a settled loss did not let RSUI know that Waters Edge was bringing a claim of misrepresentation against them based on particular provisions of the Texas Insurance Code.

Consistent with its everything-but-the-kitchen-sink approach to this appeal, Waters Edge also makes a two-sentence argument that Count IV sufficiently states a claim of common law misrepresentation sounding in negligence. Waters Edge apparently feels that the sufficiency of that claim is self-evident, as it chose not to burden that portion of its argument with citation to any authority. Generally, we deem waived "[i]ssues raised in a perfunctory manner, without supporting arguments and citation to authorities." N.L.R.B. v. McClain of Ga., Inc., 138 F.3d

14

1418, 1422 (11th Cir. 1998); see also Fed. R. App. P. 28(a)(9)(A). Waters Edge's negligent misrepresentation argument clearly fits the bill.

Even without Waters Edge's waiver of this issue on appeal, the result would be the same. Count IV does not state a facially plausible claim for relief. Under Texas law, a plaintiff seeking to recover for negligent misrepresentation must demonstrate that he justifiably relied on the misrepresentation. Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991). In paragraph 84 of the complaint, Waters Edge alleges that, due to the adjuster's statement that Prime would have to agree for Waters Edge to be paid for its loss, Waters Edge "reasonably believed [it] had no choice but to ask Prime if it would agree" to allow Waters Edge to receive payment. But the complaint, in paragraphs realleged in Count IV, states that Waters Edge's "entitlement to the agreed amount was beyond dispute" and that "RSUI knew or should have known that Prime had no insurable interest or entitlement in the estimated property loss for Plaintiffs' apartments." If Waters Edge's entitlement to receive the agreed amount from RSUI was so clear, Waters Edge could not have justifiably relied on the adjuster's statement that Prime would have to agree to allow Waters Edge to receive payment from RSUI. Because Count IV does not allow a reasonable inference that Waters Edge justifiably relied on the adjuster's alleged misrepresentation, it does not state a

15

claim of negligent misrepresentation that is plausible on its face.  See Iqbal, __

U.S. __, 129 S. Ct. at 1949.

## IV.

The district court properly dismissed Counts III and IV of the complaint for failure to state a claim on which relief can be granted.  Neither of those counts state a facially plausible claim for relief.  See Iqbal, __ U.S. __, 129 S. Ct. at 1949. Because the factual allegations contained in the complaint allow a reasonable inference that RSUI failed to fulfill its obligations under a binding settlement agreement between RSUI and Waters Edge, see id., Waters Edge has stated facially plausible claims for breach of a settlement agreement and failure to timely pay a settled claim.

Although we reverse the district court's decision to dismiss Counts I and II, we note that Waters Edge has its work cut out for it.  Waters Edge must prove the existence of a binding settlement agreement independent of the insurance policy. It must also establish that under the terms of that settlement agreement, it was entitled to direct payment from RSUI and that this right was not limited by Prime's rights under the insurance policy.  We express no opinion on whether Waters Edge will be able to make those showings.  We merely hold that the district court erred when it dismissed Counts I and II pursuant to Rule 12(b)(6) because both of those

16

counts state a facially plausible claim for relief.  See id.  Absent a settlement treaty,

the fight between RSUI and Waters Edge will continue, because the judgment of

the district court is reversed insofar as Counts I and II are concerned.

**AFFIRMED IN PART, REVERSED IN PART.**